******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* CARGIL A. NICHOLSON
(AC 36021)

DiPentima, C. J., and Prescott and Mullins, Js.

*Argued November 14, 2014—officially released February 24, 2015*

(Appeal from Superior Court, judicial district of Fairfield, Hon. George N. Thim, judge trial referee.)

*Robert E. Byron*, assigned counsel, for the appellant (defendant).

*Linda Currie-Zeffiro*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *C. Robert Satti*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. The defendant, Cargil A. Nicholson, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55. The defendant claims that (1) the state failed to present sufficient evidence to disprove his defense of premises justification defense beyond a reasonable doubt, and (2) the prosecutor engaged in impropriety during closing argument by resorting to conjecture and asserting facts that were not based on the evidence, and by making false statements to the jury concerning the law. We affirm the judgment of the trial court.

On the basis of the evidence presented, the jury reasonably could have found the following facts. On March 13, 2012, at approximately 6 p.m., the victim, James Cleary, was dropped off in front of his apartment building by Michael Vena and Vincent Falkner, with whom he had worked cutting down a tree that day. The victim carried his two chain saws with him into the apartment. Vena then drove around to the back of the apartment building, where he and Faulkner put the victim's climbing gear and ropes into the victim's van. The victim greeted his wife and put down his chain saws. The music from the apartment upstairs was quite loud, and the victim's wife complained to him.[1] The victim proceeded to go upstairs, and his wife followed behind him.

The victim's wife remained down the hallway while the victim knocked on the defendant's door, and the door opened. The victim started yelling at the defendant to turn down the music. The victim was approximately fifty years old, weighed approximately 156 pounds, and was five feet, nine inches tall. The defendant, who was approximately five feet, seven inches to five feet, eight inches tall, and weighed approximately 175 pounds, then punched the victim in the face. The victim hit him back. The defendant then pulled the victim into the apartment and a scuffle ensued, which was heard by the victim's wife, who had remained down the hallway. The defendant called the victim "the f-ing white devil." The defendant then repeatedly hit the victim with an umbrella.

The defendant's live-in girlfriend, Tracy Wright, had been in the bathroom washing her hair when the scuffle first ensued. Upon exiting the bathroom, Wright saw the defendant and the victim fighting. Wright tried to get between the victim and the defendant to stop the fight, but the victim pushed her back. The defendant then grabbed a stool with both hands and hit the victim in the back with it at least once, but may have hit him as many as four times. The force of the blow to the back was "pretty hard," hard enough that the victim would "feel the pain." Wright told the defendant to put down the stool, thinking that the defendant could hurt

or kill the victim with the stool, and the defendant complied.

Wright then grabbed the victim by the arm, and, while standing beside him, opened the door, and the victim went out into the hallway, proceeding sideways through the doorway. Although Wright did not notice any blood or witness the victim being stabbed, the defendant, after putting down the stool, had picked up a knife from the counter and had stabbed the victim in the back, either before or shortly after Wright had grabbed the victim by the arm. The stab wound in the victim's back was seven and one-quarter inches deep. After getting the victim out of the apartment, Wright called 911, telling the dispatcher that she had pushed the victim out the door. The defendant washed off the knife before the police arrived.

The altercation inside the apartment took only seconds, and when the victim staggered out of the defendant's apartment, he told his wife that the defendant had stabbed him in the back. The victim's shirt was pulled up, his woolen cap had been pulled off, and he was bleeding from his back. Panic stricken, the victim's wife ran downstairs, where she grabbed her purse so that she could take the victim to the hospital. She then went into the hallway looking for the victim. When she could not find him in the hallway, she went outside to the front of the house, where she saw the victim fall to his knees. The victim then told his wife that he thought he was dying. The victim's wife realized that she did not have her car keys, so she returned to the apartment to get them.

Meanwhile, Vena, who had dropped the victim off at the front of the house only five to ten minutes earlier, had finished putting away the victim's gear and was leaving the property when he saw the victim lying on the steps. Vena saw blood and immediately told Faulkner to get out of the truck and to help the victim, which he did. The victim then "stumbled" into the backseat of the truck, and Faulkner jumped into the front passenger's seat. The victim told Vena, "He stabbed me." Vena then called 911 and drove to the Main Street intersection, where he waited for the ambulance to arrive. The victim died as a result of the stab wound.

The defendant was arrested and charged with murder in violation of General Statutes § 53a-54a (a). He raised defense of premises as a justification defense, and the court instructed the jury on this defense and on lesser included offenses of murder. Following a not guilty verdict on the charge of murder, the defendant was convicted of the lesser included offense of manslaughter in the first degree. This appeal followed.

I

The defendant claims that the state failed to present sufficient evidence to disprove his defense of premises

justification defense beyond a reasonable doubt. He argues that he produced evidence that the victim was a trespasser and an aggressor in this situation. The defendant argues that, in accordance with General Statutes § 53a-20 (2),[2] he produced evidence that he "reasonably believ[ed] that deadly force was necessary to prevent an attempt by the trespasser to commit . . . any crime of violence." (Internal quotation marks omitted.) Additionally, the defendant argues that he produced evidence that he reasonably believed that the victim "would continue to attack him and inflict great bodily harm." (Internal quotation marks omitted.) Accordingly, he argues that, because he met his burden of production, the burden was on the state to disprove his justification defense, which it then failed to do. We are not persuaded that the state failed to meet its burden to disprove beyond a reasonable doubt that the defendant's use of deadly physical force was justified.

"On appeal, the standard for reviewing sufficiency claims in conjunction with a justification offered by the defense is the same standard used when examining claims of insufficiency of the evidence. . . . In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . Moreover, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . .

"The rules governing the respective burdens borne by the defendant and the state on the justification of self-defense [and defense of premises] are grounded in the fact that [u]nder our Penal Code, self-defense, as defined in [General Statutes] § 53a-19 (a) [and defense of premises as defined in § 53a-20 are] . . . defense[s], rather than . . . affirmative defense[s]. See General Statutes § 53a-16.[3] Whereas an affirmative defense requires the defendant to establish his claim by a preponderance of the evidence, a properly raised defense places the burden on the state to disprove the defendant's claim beyond a reasonable doubt. See General Statutes § 53a-12. Consequently, a defendant has no burden of persuasion for a claim of self-defense [or defense of premises]; he has only a burden of production. That is, he merely is required to introduce sufficient evidence to warrant presenting his claim . . . to the jury. . . . Once the defendant has done so, it becomes the state's burden to disprove the defense

beyond a reasonable doubt." (Citations omitted; emphasis omitted; footnote added; internal quotation marks omitted.) *State* v. *Revels*, 313 Conn. 762, 778–79, 99 A.3d 1130 (2014); see also *State* v. *Terwilliger*, 294 Conn. 399, 408, 984 A.2d 721 (2009) (defendant bears initial burden of producing sufficient evidence to raise issue of defense of premises).

"Whether the defense of the justified use of force, properly raised at trial, has been disproved by the state is a question of fact for the jury, to be determined from all the evidence in the case and the reasonable inferences drawn from that evidence. . . . As long as the evidence presented at trial was sufficient to allow the jury reasonably to conclude that the state had met its burden of persuasion, the verdict will be sustained." (Internal quotation marks omitted.) *State* v. *Johnson*, 71 Conn. App. 272, 280, 801 A.2d 890, cert. denied, 261 Conn. 939, 808 A.2d 1133 (2002), cert. denied, 537 U.S. 1207, 123 S. Ct. 1286, 154 L. Ed. 2d 1052 (2003).

In order to determine whether the state produced sufficient evidence to disprove beyond a reasonable doubt the defendant's justification defense, we first must set forth the defendant's theory of defense. See *State* v. *Revels*, supra, 313 Conn. 779. Pursuant to the defendant's defense of premises theory; see General Statutes § 53a-20; he presented evidence that the victim was a trespasser in the defendant's home, that the victim was bigger and stronger than the defendant, and that the victim kept attacking him. He also produced evidence that his response was necessary to prevent the victim from committing "any crime of violence" and that his response was proportional to the victim's aggression and the defendant's fear for his life.

In particular, the defendant testified that the angry victim arrived at his apartment, and repeatedly banged on the door. When the defendant opened the door, the victim rushed in, uninvited, and began "beating the hell" out of the defendant, who tried to protect himself by hitting the victim with an umbrella and then with a stool. The defendant and Wright repeatedly yelled at the victim to leave the apartment. When all of these things failed, the defendant picked up a knife off the counter, and the victim then rushed toward the defendant, head down and bent at the waist, charging full force. Fearing for his life, the defendant testified that he had no choice but to stab the victim in the back to prevent serious injury to himself or to Wright.

Thus, the defendant's theory was that he reasonably believed that it was necessary for him to use deadly physical force against the victim because the victim was a trespasser and was the initial aggressor. Further, the victim would not leave the premises, he continued to assault the defendant, and the defendant reasonably feared for his life. He also contended that his response was proportional to the force being used against him.

The state introduced the following evidence to disprove the defendant's defense of premises justification defense. The victim, followed by his wife, went upstairs to confront the defendant about the loud music being played and began knocking on the defendant's door. The defendant opened the door, and the victim yelled at him. The defendant punched the victim, and the victim responded in kind. The defendant then pulled the victim into the apartment and a scuffle ensued. The defendant repeatedly hit the victim with an umbrella. When Wright came out of the bathroom, she saw a scuffle and stepped between the two men. The victim pushed Wright aside, and the defendant then picked up a stool with two hands and began swinging it, hitting the victim between one to four times. Fearing that the defendant would seriously injure or kill the victim, Wright told the defendant to put down the stool, and he complied.

Then, standing beside the victim, Wright grabbed the victim by the arm, and opened the door. The victim staggered sideways out of the apartment. The victim was in the apartment a very short time, perhaps only seconds, and, when he emerged, he told his wife that the defendant had stabbed him in the back. Wright testified that she did not see the stabbing and that she did not see the victim bleeding. In accordance with this testimony from Wright, the victim's unqualified statement to his wife that the defendant had stabbed him in the back, and the defendant's admission that he had stabbed the victim in the back *after putting down the stool*, the state argued to the jury that it would be reasonable to conclude that the stabbing occurred after Wright grabbed the victim by the arm and was showing him to the door, as she stood beside him.

Construing the evidence in the light most favorable to sustaining the verdict, we conclude that there was sufficient evidence to disprove the defendant's defense of premises justification defense beyond a reasonable doubt. The evidence was sufficient for the jury to conclude that the victim was neither a trespasser nor the initial aggressor. Indeed, the testimony of the victim's wife established that, as she watched the victim argue with the defendant while the victim stood outside of the defendant's apartment door, the defendant pulled the victim into his apartment. Her testimony further established that just before the defendant pulled the victim into his apartment, the defendant punched the victim.

Nevertheless, even if the defendant was a trespasser, there also was sufficient evidence from which the jury reasonably could conclude that the defendant used an amount of force that far exceeded any necessary force. Indeed, there was no evidence that the victim had with him any type of weapon or that he used any weapon against the defendant. Despite this, the defendant admitted hitting the victim with an umbrella and with

a stool. He also admitted that he grabbed a knife and ultimately stabbed the victim in the back with it. Moreover, the defendant was the physically weightier man in the altercation. Although the defendant contended that the victim was bigger and stronger than he, the evidence demonstrated that, although the victim was approximately one inch taller than the defendant, the defendant was approximately twenty pounds heavier than the victim.

Additionally, the defendant testified at trial that he did not stab the victim until after he had put down the stool. Wright testified that she was in the room when the defendant hit the victim with the stool and that she told the defendant to put down the stool, fearing that he would seriously injure or kill the victim with it. Wright also stated that after the defendant put down the stool, she grabbed the victim by the arm and, while standing beside him, opened the door for him to leave. Wright did not see the defendant stab the victim, and she did not see blood on the victim. The testimony established that the victim then staggered sideways through the doorway and told his wife that the defendant had stabbed him in the back.

On the basis of this evidence and the reasonable inferences drawn therefrom, the jury reasonably could have concluded that the victim was not a trespasser and that the defendant was the initial aggressor. Additionally, the jury also reasonably could have concluded that the defendant either used force far in excess of that used by the victim or that was reasonably necessary to stop the victim, or that the altercation was over before the defendant stabbed the victim in the back as he was being led out of the doorway by Wright. Accordingly, we conclude that the evidence was sufficient to support the jury's finding that the state disproved the defendant's justification defense beyond a reasonable doubt.

## II

The defendant next claims that the prosecutor engaged in impropriety by (1) making claims and statements during closing argument and rebuttal argument that were conjectural and not based on facts in evidence, and (2) making false statements concerning the law.[4] The state responds that the defendant has failed to show the existence of any prosecutorial impropriety and that, to the extent any improprieties occurred, the defendant has failed to establish that they denied him a fair trial. We agree with the state that the prosecutor did not engage in impropriety.

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether

it deprived the defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Jordan*, 314 Conn. 89, 111, 101 A.3d 179 (2014).

Our Supreme Court repeatedly has stated: "[I]n cases involving incidents of prosecutorial [impropriety] that were not objected to at trial . . . it is unnecessary for the defendant to seek to prevail under the specific requirements of [*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set [forth] by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). . . . As we stated in that case: In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time. . . . Moreover . . . defense counsel may elect not to object to arguments that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to it or because he or she wants to later refute that argument. . . . Accordingly, we emphasize that counsel's failure to object at trial, while not by itself fatal to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error . . . . Put differently . . . prosecutorial [impropriety] claims [are] not intended to provide an avenue for the tactical sandbagging of our trial courts but, rather, to address gross prosecutorial improprieties that . . . have deprived a criminal defendant of his right to a fair trial." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 280–82, 96 A.3d 1199 (2014).

"Our case law on the scope of proper argument recognizes a balance that must be struck. [P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making

closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Jordan*, supra, 314 Conn. 110–11.

With these principles in mind, we first consider whether any of the prosecutor's remarks were improper. If we determine that there were improper remarks, we then will conduct a separate analysis under the *Williams'* factors to determine whether the improprieties deprived the defendant of his right to a fair trial.

A

The defendant claims that the prosecutor's remarks during closing and rebuttal arguments were improper because they were based on conjecture rather than on the evidence. Specifically, he argues that the prosecutor made "claims and statements during closing argument and during rebuttal argument which were conjectural and not based on the facts in evidence, including (1) that the defendant stabbed the [victim] while he was standing in the doorway with his back to the defendant; (2) that the floor area near the doorway had blood on it which the defendant had wiped off; (3) that the defendant stabbed the [victim] after the fight had stopped; and (4) that the defendant did not act in self-defense, but out of a sense of humiliation from the victim having pushed . . . Wright when she first tried to stop the fight." We will consider statement two first, followed by statements one, three, and four together.

1

The defendant argues that the prosecutor engaged in impropriety by arguing to the jury that the defendant had wiped up blood from the floor area near the doorway. The defendant cites the following specific statement made by the prosecutor: "There's no blood splattered in the hallway area there which you would consider probably should be there based on the other blood spots you saw. And right outside the door it's also not there." The state argues that this statement had an evidentiary foundation and that the prosecutor was encouraging the jury to consider the evidence and to draw reasonable inferences therefrom. We agree with the state.

At trial, two detectives testified that the floor area near the doorway appeared to have been wiped clean or mopped up. Detective Mark Graham testified that he viewed a "blood-like substance" on the ceiling of the apartment, which accurately was depicted in photo-

graphs he was asked to review during his testimony. He also stated that the "foyer area in the hallway area appeared to be mopped" because of the "smudginess of dirt," that the floor area also "appeared to be cleaned up or mopped," and that "[o]utside the door in the hallway was a blood-like substance." Additionally, Detective Kimberly Biehn testified that the linoleum, just inside the hallway, "appeared to be . . . wiped up." She also stated that the floor area inside the doorway of the apartment appeared to have been "wiped with something," but that the kitchen floor did not appear to have been wiped up. In addition to this evidence, the defendant testified that he had cleaned the knife after he stabbed the victim.

On the basis of this evidence, we conclude that it was not improper for the prosecutor to have asked the jury to consider the absence of blood in the areas that appeared to have been wiped up. The prosecutor merely was commenting on the evidence and the reasonable inferences that could be drawn therefrom.

2

We next consider together the defendant's claim that the prosecutor engaged in impropriety by arguing to the jury that the defendant had stabbed the victim while he was standing in the doorway with his back to the defendant, that the defendant stabbed the victim after the fight had stopped, and that the defendant stabbed the victim because he was humiliated because the victim had pushed Wright. The defendant also complains that during his argument, the prosecutor used a "sketch" that was not in evidence to urge the jury to make improper inferences that the victim was stabbed in the back after the fight had ended.[5] The state argues that this was the prosecutor's theory of the case and that the remarks were grounded in the evidence, without any objection from the defendant. We agree with the state.

The defendant argues that there was no evidence that he stabbed the victim in the back after the fight had ended or at the doorway. He also argues that there was no evidence that he stabbed the victim because he was humiliated over the victim pushing Wright. The defendant places much emphasis on his own testimony that he stabbed the victim as the victim was rushing toward him with his back bent forward and his head down. That, however, was not the only evidence before the jury. Both Wright and the defendant testified that while the defendant and the victim were fighting, Wright stepped between the men in an effort to stop the fight, and the victim responded by pushing Wright aside. The defendant testified that he then hit the victim with a stool, and that when he began to get tired from swinging the stool, he picked up the knife from the counter. The defendant further testified that when the victim charged at him, he stabbed the victim. The defendant therefore testified that the stabbing occurring *after* he had hit

the victim with the stool.

Wright testified, however, that she was in the room and saw the altercation with the stool, and that she told the defendant to stop hitting the victim with the stool, fearing that the defendant might kill the victim, and that the defendant complied. Standing beside the victim, Wright then grabbed his arm and pushed him toward the door, not having seen a stabbing or any blood. The victim then staggered sideways out the door.

On the basis of this testimony, we conclude that it was not improper to submit to the jury that it could infer that the defendant got angry and, perhaps, felt humiliated, when the victim pushed Wright aside, and that, because Wright saw the altercation with the stool, but did not see the stabbing, that the stabbing occurred as she was standing beside the victim, pushing him to the doorway, after the fight had ended. The evidence demonstrated that the entire altercation took only seconds. Accordingly, we conclude that the prosecutor did not engage in impropriety in making these statements to the jury during closing and rebuttal arguments.

B

The defendant next claims that the prosecutor engaged in impropriety by making false statements concerning the law. The defendant argues that the prosecutor "told the jury that a person has the right to repel an intruder into their home, but they can't use deadly physical force, that is, they can't use a weapon, they can't cause serious physical injury." (Internal quotation marks omitted.) He argues that this statement is "not just wrong, it is canonically wrong." We conclude that the prosecutor's choice of words, at best, was inartful, but that, when viewed in the context of his entire closing argument; see *State* v. *Otto*, 305 Conn. 51, 77, 43 A.3d 629 (2012) ("[a] review of the statements made by the prosecutor, in the context of the entire closing argument, is necessary to address the defendant's challenges"); even if his comment was improper, that impropriety did not deprive the defendant of a fair trial.

In this case, during closing argument, the prosecutor stated: "Now I want to talk about the defense of justification. You're going to hear the court explain what's called the defense of justification, and basically I suggest—I'm just paraphrasing what I expect the court to say, but a person has a right to repel an intruder [in] their home. Now they can't use deadly physical force, that is, they can't use a weapon, they can't cause serious physical injury. So, they can repel somebody, but you have to use physical force. And it's kind of like, I suggest, a continuum. If there's a fight between a couple of people on the street and I'm punching somebody, and you're punching me back, we can punch each other, but you can't introduce a weapon. So, it has to be equal amount of force to equal the violence. So, if somebody

is in your home and you can just drag them by the arm and take them out as [Wright] did do—and you heard her today. [Wright] dragged this supposed demon, white devil, remember the defendant's term, white devil? She dragged him out, and you can't beat him up anymore." The prosecutor later stated: "Ladies and gentlemen, on the issue of disproving a defense of justification, there's a very important principle, I think that [it is] just common sense if you think about it. We talked about that before. You have a right to defend yourself, but once that threat is gone—once that threat is gone, you can't take retaliatory measures, you can't take retaliatory measures. You know, get that last good punch or kick in as the people are leaving."

Our law is clear that, although "a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom . . . prosecutors are not permitted to misstate the law . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Otto*, supra, 305 Conn. 76–77. Nevertheless, in this case, even if we were to agree that the prosecutor made an improper comment regarding the right of a defendant to use deadly physical force to repel an intruder, our analysis of the *Williams'* factors leads us to the conclusion that the defendant was not deprived of a fair trial by the impropriety.

First, the defendant did not object to the comment, and, although the comment was not invited by defense counsel, the extent of the alleged impropriety was not severe or frequent. See *State* v. *Williams*, supra, 204 Conn. 540. Second, the state's case against the defendant was fairly strong, albeit relatively circumstantial. See id. Third, although the issue of the right to use deadly force was central to the defendant's case, this was one comment near the start of closing argument, and the prosecutor clearly told the jury that he was paraphrasing and that the court would give the jury the necessary legal instructions. See id. Finally, as to the *Williams'* factor concerning the strength of the curative instruction; see id.; the defendant never asked for a curative instruction in this case. Nevertheless, the trial court carefully reminded the jury that "[t]he lawyers may have mentioned legal rules during their arguments. If you find their comments on the law differ from my explanation, you must put aside their comments." Additionally, the court thoroughly instructed the jury on the defendant's justification defense and on the use of deadly physical force, and the defendant has not asserted that the court's instructions on self-defense were improper.[6]

As our appellate courts previously have stated: "[T]he jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn.

563, 598, 849 A.2d 626 (2004). We conclude, therefore, that the court's instructions, when viewed in light of the other *Williams'* factors, were sufficient to cure any harm to the defendant possibly caused by the prosecutor's remark. Consequently, the defendant was not deprived of a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The victim and his wife previously had complained to the defendant and his girlfriend about their loud music. The defendant, at one point, called the victim's wife "a devil." The victim and his wife also telephoned the police on several occasions to complain about the noise, and the police went to the defendant's apartment on several occasions.

[2] General Statutes § 53a-20 provides: "A person in possession or control of premises, or a person who is licensed or privileged to be in or upon such premises, is justified in using reasonable physical force upon another person when and to the extent that he reasonably believes such to be necessary to prevent or terminate the commission or attempted commission of a criminal trespass by such other person in or upon such premises; but he may use deadly physical force under such circumstances only (1) in defense of a person as prescribed in section 53a-19, or (2) when he reasonably believes such to be necessary to prevent an attempt by the trespasser to commit arson or any crime of violence, or (3) to the extent that he reasonably believes such to be necessary to prevent or terminate an unlawful entry by force into his dwelling as defined in section 53a-100, or place of work, and for the sole purpose of such prevention or termination."

General Statutes § 53a-19 provides: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he or she knows that he or she can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he or she is in his or her dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he or she is a peace officer, a special policeman appointed under section 29-18b, or a motor vehicle inspector designated under section 14-8 and certified pursuant to section 7-294d, or a private person assisting such peace officer, special policeman or motor vehicle inspector at his or her direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he or she abstain from performing an act which he or she is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

[3] General Statutes § 53a-16 provides: "In any prosecution for an offense, justification, as defined in sections 53a-17 to 53a-23, inclusive, shall be a defense."

[4] We note that the defendant did not object to these arguments at trial. Additionally, insofar as the defendant also makes undeveloped arguments regarding the prosecutor's alleged mischaracterization of evidence, mischaracterization of defense counsel's argument and maligning of the defendant during closing or rebuttal argument, we have reviewed the closing and

rebuttal arguments and conclude that there is no merit to these allegations.

[5] Although the record supports the defendant's contention that the prosecutor used a sketch during his rebuttal argument, a copy of the sketch is not in the record. We also note that the defendant does not assert that it necessarily is improper for an attorney to use such visual aids. Instead, he asserts that the prosecutor's argument in this case was improper.

[6] The court instructed the jury on the use of deadly physical force as follows: "The penal code of Connecticut gives a person who is in his or her home the right to use reasonable physical force against another person when to the extent the occupant of the home reasonably believes that such force is necessary to prevent or terminate a criminal trespass. The code limits the use of deadly physical force against a trespasser to three factual situations. These situations are as follows.

"First, an occupant of a home may use deadly physical force against a trespasser to defend the occupant or another person if the occupant reasonably believes the trespasser is using or about to use deadly physical force or is inflicting or about to inflict great bodily harm. Second, an occupant of a home may use deadly physical force when the occupant reasonably believes such force is necessary to prevent an attempt by the trespasser to commit any crime of violence. Third, an occupant of a home may use deadly physical force to the extent the occupant reasonably believes such force is necessary to prevent or terminate an unlawful entry by force into the home. The homeowner or occupant may use such means as are absolutely necessary, even taking a life, to prevent the intruder's unlawful and forced entry. The deadly force must be used solely for the purpose of resisting a forceful and unlawful entry.

"A killing is not justified if the resistance to the intruder's entry is greater in degree than necessary. A killing is not justified if the occupant takes an opportunity of an unlawful entry to kill the intruder in order to gratify the occupant's hatred, malice, or ill will. The three justification rules that I have just described apply to trespassers." Additionally, the court gave further instructions on each of the three factual situations that permit the use of deadly physical force under § 53a-20. The defendant makes no claim that these instructions were inadequate.

———————————————————